UNITED STATES DISTRICT COURT

EASTERN DISTRICT OF CALIFORNIA

----oo0oo----

RAYMOND CARMAN,

        Plaintiff,

    v.

YOLO COUNTY FLOOD CONTROL AND
WATER CONSERVATION DISTRICT,

        Defendant.

NO. CIV. S-06-1374 FCD KJM

<u>MEMORANDUM AND ORDER</u>

----oo0oo----

Plaintiff Raymond Carman ("Carman" or "plaintiff") brings this action against defendant Yolo County Flood Control and Water Conservation District (the "District"), claiming violations of the Fair Labor Standards Act ("FLSA") (29 U.S.C. § 201, <u>et seq.</u>). Specifically, plaintiff seeks damages, in the form of allegedly unpaid minimum wages and overtime wages, for his work as a damtender at the Cache Creek Dam. Plaintiff also seeks equitable remedies and unpaid benefits based upon the allegedly uncompensated work hours, which would have increased plaintiff's

1

benefits under the District's Money Purchase Pension Plan. This matter comes before the court on defendant's motion for summary judgment, or in the alternative, summary adjudication. Plaintiff opposes the motion. For the reasons discussed below,[1] defendant's motion is GRANTED in part and DENIED in part.

### BACKGROUND[2]

Plaintiff Carman has been employed as a damtender by defendant District at the Cache Creek Dam (the "Dam") from approximately 1984 through March 17, 2006, and has resided at the Dam since 1984. (PUF ¶ 53; Decl. of Raymond Carman ("Carman

---

[1]    Because oral argument will not be of material assistance, the court orders these matters submitted on the briefs. E.D. Cal. Local Rule 78-230(h).

[2]    Unless otherwise noted, the facts recited herein are undisputed. (See Pl.'s Response to Def.'s Stmt. of Uncontroverted Material Facts ("PUF"), filed Jan. 11, 2008). Where the facts are disputed, the court recounts plaintiff's version of the facts. (Pl.'s Stmt. of Disputed Facts ("SDF"), filed Jan. 3, 2008).

Plaintiff asks this court to take judicial notice of a declaration filed by Raymond Carman in a related action previously heard by this court, Watson v. Yolo County Flood Control and Water Conservation District, No. 06-cv-01549. However, plaintiff's deposition testimony, given after the declaration was filed with this court, reveals that Carman had never before seen the declaration. (Dep. of Raymond Carman ("Carman Dep."), filed Dec. 13, 2007, at 233:13-15; 234:4-6). As such, the court cannot accept plaintiff's prior assertion that the declaration was true and correct and based upon plaintiff's personal knowledge, nor can the court rely on the contents of this declaration as admissible evidence. See Fed. R. Civ. Proc. 56(d) (requiring that supporting affidavits be made on personal knowledge by an affiant that is competent to testify to the matters stated therein). However, the court does consider plaintiff's declaration submitted in support of this motion, which contains many of the same or similar assertions.

Both plaintiff and defendant file numerous objections to each other's evidence. Unless otherwise addressed, such evidence is immaterial to the court's analysis or the objections are otherwise without merit.

2

Decl."), filed Jan. 3, 2008, ¶ 1; PUF ¶ 87).  The District was created by the Legislature in 1951 for the purpose of controlling, managing, and distributing water.  (PUF ¶ 27).  The District is a political subdivision and public agency of the State of California.  (PUF ¶ 28).  In 1967, the voters in the District authorized the purchase of the privately owned Clear Lake Water Company and the Dam.  (PUF ¶ 30).  The District then began operating the enterprise, which included the right to store water in Clear Lake.  (PUF ¶ 30).

The Dam is located approximately five miles downstream of Clear Lake, and the waters from that lake are controlled by the dam.  (SDF ¶ 3).  Clear Lake is the largest lake that supplies Cache Creek and is the primary water source for the Dam.  (SDF ¶ 7).  Clear Lake is used for recreational purposes, including boating and fishing, and Cache Creek is also open to the public for recreational purposes.  (SDF ¶¶ 20-21).  The Dam and the two mile long access road to the dam is not open to the public and has not public campgrounds, boat ramps, day use amenities, or other recreational facilities.  (PUF ¶¶ 31, 52).

The District actively manages the Dam to provide deliveries of water to agricultural users and, in the average year, provides approximately 150,000 acre-feet of irrigation water to more that 55,000 acres of agricultural fields.  (PUF ¶¶ 33; 49).  The District receives orders for deliveries of water from agricultural users, and only delivers water when there is a

3

demand or order. (PUF ¶ 35).[3]  Such deliveries typically occur during "irrigation season" which begins in March or April and continues through September or October in any given year. (PUF ¶ 35).  There may be deliveries in other months and, whether deliveries take place in "irrigation season" or otherwise, the District maintains records of these deliveries. (PUF ¶ 35).  Pursuant to contract, the District also provides water to public and private water companies in Lake County for domestic and potable uses. (PUF ¶ 33).  These companies draw water from the lake using their own infrastructure and report their water usage to the District. (PUF ¶ 33).  The District measures and controls deliveries of water and accounts for usage by others who utilize a portion of the District's water rights pursuant to contract. (PUF ¶ 34).

Throughout the year, the District is required to comply with decrees respecting the limits on the District's storage rights in Clear Lake, and must operate the Dam within parameters dictated by state and federal laws. (Am. Decl. of Christy Barton ("Barton Decl."), filed Dec. 17, 2007, ¶ 4).  The District asserts that

---

[3]  Plaintiff objects to this fact and other similar facts on the grounds that the statements made by Christy Barton ("Barton"), Assistant General Manager of the District, lack foundation.  Plaintiff's objections are OVERRULED.  Barton declared that she is directly involved in the District's deliveries of water and the management its dams.  This lays the requisite foundation for her to make declarations with respect to the water delivered to agricultural users, the water used by other companies, and the level of water in the Dam and Clear Lake.  Plaintiff contends that these statements are in contradiction to deposition testimony that she does not know the duties of damtenders.  The court finds that these statements are not contradictory.  Barton may be knowledgeable of the amount of water delivered and the general management of the dams without knowing the precise duties of damtenders.

its rights in regard to Clear Lake extend only to the supply and storage of water between zero and 7.56 feet on the Rumsey Gauge and that it has no responsibility for, authority over, or ability to control activities that take place on the lake. (PUF ¶ 32; Barton Decl. ¶ 4). The District also contends that it has no right to utilize water below zero or to store water in excess of 7.56 feet on the Rumsey Gauge, and must operate the Dam to release waters in excess of 7.56 feet. (Barton Decl. ¶ 4). Moreover, the District asserts that it does not use the dam to facilitate any activities that may take place on the lake. (PUF ¶ 32). Plaintiff asserts that the District uses the dam to control the levels of Clear Lake to facilitate recreational use in the summer and to prevent flooding in the winter. (PUF ¶ 32).

Carman's duties as a damtender included performing routine maintenance for the Dam and related facilities, inspecting dam facilities and reporting current status, maintaining water releases related to the Dam, reading meters and logging water releases, maintaining batteries, maintaining the auxiliary generators, operating road graders, backhoes, and front end loaders, repairing plumbing, preparing data reports each month on weather conditions at the dam site, performing tasks in the maintenance of dam facilities, hand cranking to open and close water spillways, and reading and recording lake levels and discharge and precipitation readings. (PUF ¶ 1). The damtender is responsible for making sure adjustments are timely and accurate and for monitoring levels to assist the District in the proper distribution of water to end users. (PUF ¶ 42). However, Carman's most important job as damtender was to make sure that he

is releasing the waters in accordance with the District's
instructions.  (PUF ¶ 7).

Carman generally inspected the gauges in the morning, and
the District would call him at approximately 11:00 a.m. if
adjustments to the dam gates were necessary to facilitate
deliveries of water.  (PUF ¶ 8).  The physical act of adjusting
the gate could take as little as ten minutes or up to three
hours, depending upon how many times a gate needed further
adjustments to come into specification.  (PUF ¶ 10; Carman Decl.
¶ 18).  The time it takes to confirm whether the adjustment was
correct depends upon how much water is released.  (PUF ¶ 11).  It
may take as little as one hour for the adjustment to register on
the gauges when large amounts of water are released or as much as
five hours when smaller amounts of water are released.  (PUF ¶
11).  Carman would also make entries in the Clear Lake Dam Record
of Operations on a daily basis.  (PUF ¶ 12).  These entries
reflected the dam level, the flow, the lake level, whether it was
raining, the temperature, what gates were in operation, and other
significant events; these records served the purpose of
demonstrating the daily operation of the dam, compliance with
applicable rules and regulations, and plaintiff's performance of
expected duties.  (PUF ¶ 13).  On some days, the entries
indicated one reading per day.  (See PUF ¶ 20).  However, Carman
contends that the number of entries does not reflect the number
of occasions that he took readings; he would take readings to
ensure the flow was right and not log it because it was for his
own information in maintaining the facility at the District's
standards.  (See PUF ¶ 20; SDF ¶ 58).  Plaintiff estimates that

6

he made readings five to six times a day, especially when there was a change.  (SDF ¶ 61).  Carman contends that to read and record all monitors on a daily basis took several hours a day during irrigation season and took about an hour and a half during non-irrigation season.  (SDF ¶ 63).  Carman also asserts that during flood season, it can take 24 hours a day to read and record all monitors on the dam log.  (SDF ¶ 75).

After the hydroelectric facility went off-line, Carman spent between one and three hours per day maintaining the facility. (SDF ¶ 50).  He was responsible for, among other things, removing debris, keeping trespassers off the property, replacing spillway beams, keeping lights workings, weed spraying, keeping sliding rocks down, maintaining the septic, electrical, and plumbing system, painting, maintaining the lawns and grounds, maintaining tools and equipment, and replacing things that broke.  (SDF ¶¶ 49, 52).  The damtender has discretion to determine how and when to perform these duties and when to take breaks.  (PUF ¶ 88).

Carman also performed work on the water system at the Indian Valley Reservoir (the "Reservoir") starting in approximately 1994.  (PUF ¶ 23; Carman Decl. ¶ 22).  The amount of work performed by plaintiff varied over the years, but he generally went to the Reservoir once or twice a week, sometimes biweekly, and for emergencies.  (Carman Decl. ¶ 22).  When Carman performed work at the Reservoir, it would take from five to seven hours per day.  (SDF ¶ 51).  He would also attempt to solve problems over the phone with the Reservoir's damtender if called for advice. (Carman Decl. ¶ 22).

/////

7

Carman contends that he was on the job and available at all times. (SDF ¶ 107). He asserts that he carried a mobile phone and pager, issued by defendant, at all times. (Carman Decl. ¶ 33). He received between 10 and 20 notification a year. (PUF ¶ 125). Carman also asserts that he understood that he needed to be able to respond and be ready to work within thirty minutes of receiving notice. (Carman Decl. ¶ 33). Plaintiff contends that because it took eighteen minutes to go from the damtender residence to the last gate, he could only go twelve minutes from the last gate into town. (Id.) He went out to a meal with his wife approximately once a month, but they always traveled in two different cars in case he was called to return to the dam. (Id. ¶ 34). During flood season, there were times where plaintiff did not leave the Dam for up to two weeks at a time because of the weather and risk of flooding. (Id. ¶ 35).

The District contends that plaintiff was able to engage in a variety of personal activities in his free time. Carman installed a deck, pool, hot tub, and several workshops at the residence at the Dam. (PUF ¶ 89). Over the years Carman has made other improvements to the residence, including repainting it and replacing the refrigerator, water heaters, and swamp coolers. (PUF ¶ 90). Carman was free to have visitors, and his grandson stayed on the property approximately fifteen to twenty times over the past five years. (PUF ¶ 112). Carman could also spend his free time watching television. (PUF ¶ 116). Moreover, Carman has been a member of the Masonic Lodge for fifteen years. (PUF ¶ 118). Plaintiff attended one meeting per month, if the season and weather permitted, and spent from two to eight hours per

month performing duties associated with the lodge. (PUF ¶ 118).
Further, Carman took classes offsite at Yuba College or in
Sacramento to maintain his water license. (PUF ¶ 117).
Plaintiff considered these classes to be part of his job. (PUF ¶
117).

Prior to accepting the position of damtender, Carman met
with the District's General Manager to discuss the position,
including its duties and compensation. (PUF ¶ 54). Carman's
employment began with his written acceptance of the District's
offer of employment, and thereafter was governed by a series of
written contracts, the last of which was signed in 1992. (PUF ¶
54). These agreements set forth the terms and conditions of
plaintiff's employment, and provided that he would be responsible
for the operation and maintenance of the dam on a daily basis.
(PUF ¶ 58). However, plaintiff contends that the terms of the
agreement expired in 1995. (PUF ¶ 58).

Plaintiff understood that he would receive the same salary
amount, regardless of the number of hours he worked. (Dep. of
Raymond Carman, Ex. A to Decl. of Stephen R. McCutcheon, Jr., at
255:8-11). However, plaintiff contends that there was no
discussion regarding the number of hours he was required to be
working and that the District never told him to keep a timecard.
(Id. at 255:2-7; SDF ¶ 80). Plaintiff also contends that the
General Manager of the District, Tim O'Halloran, never told
plaintiff that he expected plaintiff to complete his job in 40
hours per week. (SDF ¶ 82). The District contends that in 1995,
in response to plaintiff's request for higher wages and better
living and working conditions, it tasked a personnel committee

9

with the duty to review the damtenders' duties and compensation and to provide him with wage and salary information to consider. (PUF ¶¶ 66-67).  The committee recommended that Carman's salary be increased by $419.38, which was given effect by the District and accepted by Carman.  (PUF ¶ 70).

In the fall of 2001, Carman went directly to the District's Board of Directors to request that the District provide additional holiday compensation for damtenders.  (PUF ¶ 73).  On February 2002, the District issued a memorandum with respect to holiday pay, providing that it would pay additional pay for work actually performed.  (PUF ¶ 75).  The District expressly stated its anticipation that during a year when there are no water releases being made and there are no storms occurring on the watershed, plaintiff should normally be able to take the holiday off.  (PUF ¶ 75).  To claim holiday pay, Carman was to seek prior authorization, except for in an emergency, and was required to provide documentation of the hours worked, an explanation of the work and why it was required, and who authorized the work.  (PUF ¶¶ 60, 76).  After receiving the memo, Carman never sought holiday pay.  (PUF ¶ 77).

Defendant asserts that after O'Halloran became general manager in 2003, he and Carman discussed the damtender duties on several occasions.  (PUF ¶ 79).  Defendant contends that Carman expressed his satisfaction with the status quo.  (PUF ¶ 82). Plaintiff contends that he never expressed satisfaction with his working conditions or wages.  (PUF ¶ 82).  Plaintiff told O'Halloran that he worked twenty four hours a day, seven days a week.  (PUF ¶ 84).  O'Halloran took this as a figure of speech.

(PUF ¶ 84).

In November 2003, the District hired a consultant, CPS Human Resource Services, to evaluate its employment practices and personnel operations and to prepare a report. (SDF ¶ 121). Barton and O'Halloran received copies of the report. (SDF ¶ 123). The report states, "I have a concern about the two contract staff and whether they are truly FLSA exempt." (SDF ¶ 125). The report further provides under "Section VIII – Contract Employees":

> The District currently has two employees who typically work under contract. One employee is currently without a contract. Further, both employees are stationed at remote sites, without regular supervision, work long hours during the season, receive District provided housing and vehicle, have considerable flexibility regarding scheduling of work, and employ their spouses to assist with work. Both positions need to be evaluated closely for FLSA exemptions and appropriateness of total compensation and overtime liability. The employment contract was not provided for review, and legal review is advisable prior to entering into a new contract.

Req. for Judicial Notice No. 2, Ex. A to Decl. of Karen Tynan ("Tynan Decl."), filed Jan. 3, 2008, at 16; SDF ¶ 126). The District never adopted any of the recommendations. (SDF ¶ 128).

**STANDARD**

Summary judgment is appropriate when it is demonstrated that there exists no genuine issue as to any material fact, and that the moving party is entitled to judgment as a matter of law. Fed. R. Civ. P. 56(c); Adickes v. S.H. Kress & Co., 398 U.S. 144, 157 (1970).

Under summary judgment practice, the moving party

> [A]lways bears the initial responsibility of informing the district court of the basis of its motion, and identifying those portions of "the pleadings,

depositions, answers to interrogatories, and admissions on file together with the affidavits, if any," which it believes demonstrate the absence of a genuine issue of material fact.

Celotex Corp. v. Catrett, 477 U.S. 317, 323 (1986). "[W]here the nonmoving party will bear the burden of proof at trial on a dispositive issue, a summary judgment motion may properly be made in reliance solely on the 'pleadings, depositions, answers to interrogatories, and admissions on file.'"   Id. at 324.   Indeed, summary judgment should be entered against a party who fails to make a showing sufficient to establish the existence of an element essential to that party's case, and on which that party will bear the burden of proof at trial.   Id. at 322.   In such a circumstance, summary judgment should be granted, "so long as whatever is before the district court demonstrates that the standard for entry of summary judgment, as set forth in Rule 56(c), is satisfied."   Id. at 323.

If the moving party meets its initial responsibility, the burden then shifts to the opposing party to establish that a genuine issue as to any material fact actually does exist. Matsushita Elec. Indus. Co. v. Zenith Radio Corp., 475 U.S. 574, 585-87 (1986); First Nat'l Bank v. Cities Serv. Co., 391 U.S. 253, 288-289 (1968).   In attempting to establish the existence of this factual dispute, the opposing party may not rely upon the denials of its pleadings, but is required to tender evidence of specific facts in the form of affidavits, and/or admissible discovery material, in support of its contention that the dispute exists.   Fed. R. Civ. P. 56(e).   The opposing party must demonstrate that the fact in contention is material, i.e., a fact

12

that might affect the outcome of the suit under the governing law, <u>Anderson v. Liberty Lobby, Inc.</u>, 477 U.S. 242, 248 (1986), and that the dispute is genuine, i.e., the evidence is such that a reasonable jury could return a verdict for the nonmoving party, <u>Id.</u> at 251-52.

In the endeavor to establish the existence of a factual dispute, the opposing party need not establish a material issue of fact conclusively in its favor.  It is sufficient that "the claimed factual dispute be shown to require a jury or judge to resolve the parties' differing versions of the truth at trial." <u>First Nat'l Bank</u>, 391 U.S. at 289.  Thus, the "purpose of summary judgment is to 'pierce the pleadings and to assess the proof in order to see whether there is a genuine need for trial.'" <u>Matsushita</u>, 475 U.S. at 587 (quoting Rule 56(e) advisory committee's note on 1963 amendments).

Finally, to demonstrate a genuine issue, the opposing party "must do more than simply show that there is some metaphysical doubt as to the material facts. . . . Where the record taken as a whole could not lead a rational trier of fact to find for the nonmoving party, there is no 'genuine issue for trial.'" <u>Matsushita</u>, 475 U.S. at 586-87, 106 S. Ct. at 1356.

**ANALYSIS**

On June 21, 2006, plaintiff filed a complaint for damages in this action, alleging (1) failure to pay overtime in violation of the FLSA; (2) failure to pay minimum wage in violation of the FLSA; (3) restitution of unpaid overtime wages in violation of California's Unfair Trade Practices Act; (4) restitution of unpaid minimum wage in violation of California's Unfair Trade

13

Practices Act; (5) failure to provide meal and rest periods in violation of Labor Code § 226.7; and (6) equitable remedies and unpaid benefits.  (Compl. [Docket #1], filed June 21, 2006).  The parties stipulated to the dismissal of plaintiff's Third and Fourth claims for relief.  (Stipulation of Dismissal [Docket #8], filed Sept. 11, 2006).  In his opposition, plaintiff concedes that he does not have a claim for meal or rest periods pursuant to Labor Code § 226.7, the basis for his Fifth claim for relief.  Accordingly, defendant's motion for summary judgment regarding plaintiff's Fifth claim for relief GRANTED.  Thus, the remaining claims at issue in this motion are plaintiff's claims based upon failure to pay overtime and minimum wage in violation of the FLSA and for equitable remedies and unpaid benefits.

**A.   Irrigation Exemption to the FLSA**

Defendant contends that plaintiff is not entitled to the payment of overtime wages as set forth in the FLSA because plaintiff's employment falls within the "irrigation" exemption to the FLSA.  "The FLSA is construed liberally in favor of employees; exemptions 'are to be narrowly construed against the employers seeking to assert them." Cleveland v. City of Los Angeles, 420 F.3d 981, 988 (9th Cir. 2005) (quoting Arnold v. Ben Kanowsky, Inc., 361 U.S. 388, 392 (1960)); Dole v. West Extension Irrigation Dist., 909 F.2d 349, 352 (9th Cir. 1990).  An FLSA exemption will only be found to apply in contexts that are "plainly and unmistakably within the given exemption's terms and spirit." Id.  Therefore, the District has the burden to demonstrate that plaintiff meets each element of the irrigation

/////

14

exemption and that plaintiff fits "plainly and unmistakably" within the terms and spirit of the exemption.  See id.

The irrigation exemption to the FLSA provides that the maximum hour requirements of the FLSA shall not apply to

> any employee employed in agriculture or in connection with the operation or maintenance of ditches, canals, reservoirs, or waterways, not owned or operated for profit, . . . and which are used exclusively for supply and storing of water, at least 90 percent of which was ultimately delivered for agricultural purposes during the preceding calendar year.

29 U.S.C. § 213(b)(12) (West 2007).  In order to carry their burden on summary judgment, the District must show that there are no disputed issues of material fact that: (1) plaintiff is employed in connection with the operation or maintenance of ditches, canals, reservoirs, or waterways; (2) the ditches, canals, reservoirs, or waterways are not owned or operated for profit; (3) the ditches, canals, reservoirs, or waterways are used exclusively for supply and storing of water; and (4) at least 90 percent of that water was ultimately delivered for agricultural purposes during the preceding year.

Plaintiff contends that the irrigation exemption to the FLSA does not apply because the Dam is not used exclusively for the storage and supply of water.[4]  Plaintiff argues that the court must consider Clear Lake and Cache Creek, both of which are used for recreational facilities, in its determination of the applicability of the irrigation exemption.  Plaintiff also

_____

[4] Plaintiff asserts that there are triable issues of fact as to all four of the elements that defendant must satisfy. Based upon the court's finding, *infra*, with respect to this element, the court need not reach the merits of the others.

contends that, in addition to the supply and storing of water, the Dam is used for flood control purposes.

Prior to 1997, the irrigation exemption to the FLSA provided that:

> Any employee employed in agriculture or in connection with the operation or maintenance of ditches, canals, reservoirs, or waterways, not owned or operated for profit, or operated on a sharecrop basis and which are used exclusively for supply and storing of water ultimately delivered for agricultural purposes.

The 1997 amendment to § 213(b)(12) added the phrase "at least 90 percent of which was ultimately delivered for agricultural purposes during the preceding calendar year."  29 U.S.C. § 213(b)(12).  This court has recently interpreted the post 1997 irrigation exemption and noted that in amending section 213(b)(12), Congress did not remove the term "exclusively" from the language of the statute.  Watson v. Yolo County Flood Control and Water Conservation Dist., No. Civ 06-1549, 2007 WL 3034267, at *5-6 (E.D. Cal. Oct. 17, 2007). As such, the court determined that it must give that term "force." Id. at *6; Dole, 909 F.2d at 351 (noting that Congress used the term "exclusively" in defining the exemption and that the Ninth Circuit must give that term "force"); see also Sanders v. Elephant Butte Irrigation Dist. of New Mexico, 112 F.3d 468 (10th Cir. 1997) (adopting the Ninth Circuit's rationale and holding that the irrigation exemption did not apply to a ditchrider employed by the defendant District whose water was used for lawns, shrubbery, gardens, and orchards despite the District's operating practices that purportedly prohibited such non-agricultural use).  By its definition, the term "exclusively" cannot and does not mean 90

16

percent.  Id.  Thus, the two statutory terms, "exclusively" and "90 percent," cannot be conflated.  Id.  A plain reading of the statute, giving force to each of the terms set forth by Congress, demonstrates that the term "exclusively" applies to the supply and storing component while the "90 percent" applies to the delivery component.  Id.  Furthermore, this court's interpretation of the function of the term "exclusively" in § 213(b)(12) narrowly construes the section against defendant District.  Id.; see Arnold, 361 U.S. 388 at 392; Cleveland, 420 F.3d at 988; Dole, 909 F.2d at 352.[5]

It is undisputed that the Dam was not open to the public and was not used for any type of recreational activities.  However, plaintiff asserts that the Dam is not used exclusively for the supply and storing of water as required by the irrigation exemption because it is also used for flood control purposes.  The court disagrees.

The District has rights to supply and store water in Clear Lake between zero and 7.56 feet on Rumsey Gauge.  The District must release waters in excess of 7.56 feet because it has no

---

[5]    The court notes that its interpretation conflicts with the only other federal district court case to address the interpretation of the irrigation exemption to the FLSA after the 1997 amendment, Avila v. Turlock Irrigation District, 2006 WL 3437549 (E.D. Cal. Nov. 27, 2006).  In Avila, the court found that the 1997 amendment expanded the term "exclusively" to mean that 90 percent, rather than 100 percent, of the water must be delivered for agricultural purposes.  Id. at *14.  As such, the court rejected plaintiff's argument that the exemption could only be applied in circumstances where the ditches, canals, reservoirs, or waterways were used exclusively for the supply and storing of water and not for operation or maintenance of water delivered or managed for other purposes.  Id. at *13.  In light of the intra-district split created by this court's decision in Watson, the court stayed the Watson case and certified the issue for interlocutory appeal.

rights to store such water in Clear Lake.  As plaintiff himself
points out, these releases and maintenance of levels are by court
decree.  (See Pl.'s Req. for Jud. Notice No. 3, filed Jan. 3,
2008 ("Under the Gopcevic Decree, damtenders were perpetually
enjoined and restrained from at any time, or in any way, raising
the level of said lake in excess of 7.56 feet above zero on said
Rumsey Gauge and from lowering the level of said lake below zero
on said Rumsey Gauge.").  Plaintiff also contends that the
District is charged with operating the Dam to maintain the water
in Clear Lake to provide sufficient water for recreational
purposes.  However, limitations on the District's ability to
supply and store water in the Dam does not change the use of the
water.  The court decrees, storage rights, and other obligations
regarding requisite minimum and maximum water levels may have
been imposed to serve purposes such as controlling floods in
surrounding areas and retaining sufficient water for recreational
use.  However, the purposes of the limitations imposed on the
supply and storing of water in the Dam do not change the actual
function and use of the Dam.  Plaintiff was required to operate
the Dam in compliance with all the applicable laws and
regulations and thus, releases had to be made to ensure certain
water levels.  Furthermore, there is no evidence that the Dam
maintained and operated by plaintiff was used for anything but
the supply and storing of water.

The facts relating to Carman's employment at the Dam are
distinguishable from the facts of this court's prior decision in
Watson, 2007 WL 3034267.  In Watson, it was undisputed that the
Indian Valley Reservoir (the "Reservoir"), where the plaintiff

18

served as a damtender, was open to the public and used for recreational purposes. Id. at *5. Further, it was also undisputed that the plaintiff's employment duties included functions related to the recreational activities that took place in the Reservoir and on the campgrounds. Id. at *2.[6] In this case, plaintiff cannot point to any such undisputed evidence regarding alternate uses of the Dam and related duties assigned to him as a damtender at the Dam.

Plaintiff also argues that the irrigation exemption to the FLSA does not apply because part of his job duties included periodic work at the Reservoir. Plaintiff asserts that, in Watson, this court determined that the Reservoir is not used exclusively for the supply and storage of water; thus, the irrigation exemption is similarly inapplicable to his case. The court agrees.[7]

It is undisputed that Carman's employment duties with the District included periodic maintenance of the potable water system at the Reservoir. Plaintiff went to the Reservoir once or twice a week at most, sometimes biweekly, and for emergencies. (Carman Decl. ¶ 22). Plaintiff also addressed problems by telephone with the Reservoir's damtender. (Id.) Because plaintiff's employment responsibilities included work at the

---

[6]   Because these facts were undisputed, the court did not undertake a detailed analysis with respect to the assertion that the reservoir was used for flood control purposes.

[7]   The court takes judicial notice of its Memorandum and Order in the related case of Watson v. Yolo County Flood Control & Water Conservation District. Neither plaintiff nor defendant raise arguments or present evidence that would affect this court's prior analysis regarding whether the Reservoir was used exclusively for the supply and storing of water.

Reservoir, which the court has already determined was not used exclusively for the supply and storage of water, the irrigation exemption does not apply.

Defendant fails to offer any argument with respect to plaintiff's employment responsibilities at the Reservoir. Rather, defendant attempts to distinguish the use of the Dam from the uses of the Reservoir.  The court agrees with these distinctions.  However, the court cannot ignore that part of Carman's employment with the District involved maintenance of the potable water system at the Reservoir.  Moreover, the court must narrowly construe exemptions to the FLSA "against the employers seeking to assert them." <u>Cleveland</u>, 420 F.3d at 988; <u>Dole</u>, 909 F.2d at 352.  Therefore, because plaintiff's employment included work at a waterway that was not used exclusively for the supply and storing of water, defendant's motion for summary judgment on the basis that the irrigation exemption to the FLSA applies is DENIED.[8]

/////

/////

---

[8]    To the extent defendant seeks to rely on <u>Wright v. Salt River Valley Water Users' Association</u>, 94 Ariz. 318 (1963), the facts in this case are distinguishable.  In <u>Wright</u>, the court declined to find that the defendant employer and owner of the waterway was the alter ego of the power plant that was using the waterway to generate electricity.  <u>Id.</u> at 324.  In this case, it is undisputed that defendant employer, the District, was using the Reservoir for recreational purposes.  Moreover, in <u>Wright</u>, the court relied heavily on the fact that the plaintiff's duties were solely concerned with impounding and distributing irrigation water to farmers.  <u>Id.</u> at 324-25.  In this case, Carman's work at the Reservoir included maintenance of the potable water system, work that is not necessarily tied to the impounding and delivery of irrigation water to farmers and may be used for the benefit of the Reservoir's recreational use.

**B.   "Home Worker Exception" to the FLSA**

Defendant also contends that plaintiff's FLSA claims for overtime and minimum wage are precluded by the "home worker exception" set forth in 29 C.F.R. § 785.23.  This section provides, in relevant part

> An employee who resides on his employer's premises on a permanent basis or for extended periods of time is not considered as working all the time he is on the premises. . . . It is, of course, difficult to determine the exact hours worked under these circumstances and any reasonable agreement of the parties which takes into account all of the pertinent facts will be accepted.

29 C.F.R. § 785.23.  This section does *not* provide employers with an exception to the overtime pay requirements of the FLSA, but "simply offers a sound methodology of calculating how many hours the employees actually worked within the meaning of the FLSA." Brigham v. Eugene Water & Elec. Bd., 357 F.3d 931, 942 (9th Cir. 2004) (finding that the agreement between the parties was reasonable, but remanding to the district court to determine how much overtime each of the employees was owed for hours exceeding 40 in a given workweek); see Leever v. Carson, 360 F.3d 1014, 1017 & n.2 (9th Cir. 2004) (using the parties' nomenclature in stating that the regulation provides an exemption from the overtime pay requirement, but recognizing that it simply offers a methodology for calculating hours).  In order for this section to be applicable, the District has the burden of proving, "'plainly and unmistakably,' that (1) there was an agreement to compensate plaintiff for his overtime work; and (2) the agreement was 'reasonable,' having taken into account 'all of the pertinent

/////

21

facts.'" <u>Leever</u>, 360 F.3d at 1018 (citing <u>Brigham v. Eugene</u>
<u>Water & Elec. Bd.</u>, 357 F.3d 931, 940 (9th Cir. 2004)).

### 1.   Existence of an Agreement

Defendant contends that during the time period for which
plaintiff is suing for unpaid overtime and minimum wages, there
was a constructive agreement between the parties.  "A
constructive agreement may arise if employees have been informed
of the overtime compensation policy and continue to work under
the disclosed terms of the policy." <u>Berry v. County of Sonoma</u>,
30 F.3d 1174, 1180 (9th Cir. 1994) (discussing the existence of
an agreement in the inquiry into whether on-call hours were
compensable under the FLSA); <u>Owens v. Local No. 169, Ass'n of W.</u>
<u>Pulp and Paper Workers</u>, 971 F.2d 347, 355 (9th Cir. 1992); <u>see</u>
<u>also</u> <u>Brigham</u>, 357 F.3d at 938.

The parties do not dispute that Carman's initial employment
with the District was pursuant to written contracts and that the
last written contract was signed in 1992 and terminated in 1995.
Plaintiff testified during his deposition that he understood
that, pursuant to the written contracts, he would receive the
same salary amount, regardless of the number of hours he worked.
Although plaintiff also testified that there was no discussion
about the number of hours he was required to work, his testimony
reflect an understanding that his only means of monetary
compensation would be through his set salary and that he would
not be paid separately for overtime.  After the expiration of the
last written contract, plaintiff continued to work for the
District under this same compensation structure.
/////

22

1    Defendant also points to a memo dated February 8, 2002,
2   addressing "Holiday Pay and Reporting Requirements." (Ex. E to
3   Barton Decl.).  This memo pertains to the District's policies
4   relating to overtime pay on holidays and provides that during the
5   year when there are no water releases being made and there are no
6   storms occurring in the watershed, plaintiff should be able to
7   take the day off.  (Id.)  The memo also directs plaintiff to call
8   for authorization if work must be performed on a holiday, unless
9   it is an emergency.  (Id.)  Further, the memo instructs that for
10  any holiday worked, plaintiff must follow-up with written
11  documentation providing the number of hours worked, why it was
12  required, and who authorized it.  (Id.)  In the absence of this
13  information, the District would presume that plaintiff did not
14  work on a holiday and no additional compensation would be
15  provided.  (Id.)  After receipt of this memo, plaintiff continued
16  to work for the District and never sought holiday pay pursuant to
17  this policy.

18    Therefore, prior to the relevant period at issue, which
19  plaintiff identifies as June 2003 through March 2006,[9] plaintiff
20  was aware of the District's policies regarding compensation both
21  generally and with respect to holidays.  Subsequently, plaintiff
22  continued to work for defendant.  As such, there was a
23  constructive agreement between plaintiff and defendant regarding
24  his hours and compensation.  See Berry, 30 F.3d at 1180; see also
25  Braziel v. Tobosa Dev. Servs., 166 F.3d 1061, 1063 (10th Cir.

26

27        [9]    See Pl.'s Opp'n to Def.'s Mot. for Summ. J. ("Pl.'s
    Opp'n"), filed Jan. 3, 2008, at 19) (stating that plaintiff is
28  making a wage claim for the years June 2003 through March 2006).

23

1  1999) ("Although it is clear from the record and appellants'

2  pleading that they became unhappy with the policy[,] it is

3  equally clear that appellants understood and acquiesced to the

4  policy when they were hired."); Bodie v. City of Columbia, 934

5  F.2d 561, 564-65 (4th Cir. 1991) ("[C]ontinuance in the job and

6  acceptance under the new plan of payment was sufficient to create

7  a valid agreement, even though the agreement was implied and not

8  in writing.").

9         **2.    Reasonableness of the Agreement**

10        While defendant has demonstrated that there was a

11  constructive agreement with plaintiff regarding overtime

12  compensation, defendant must also demonstrate that the agreement

13  was reasonable under § 785.23.  Leever, 360 F.3d at 1018.  The

14  Ninth Circuit has recognized that apart from stating that "all

15  pertinent facts" should be taken into consideration, § 785.23

16  does not specify what facts are pertinent to the reasonableness

17  inquiry.  Id. at 1019.  However, the Ninth Circuit has held that,

18  "at a minimum, an agreement must take into account some

19  approximation of the number of hours actually worked by the

20  employee or that the employee could reasonably be required to

21  work."  Id.

22        Where an agreement explicitly instructs the employee not to

23  exceed a set amount of hours without prior approval, such an

24  agreement may be deemed reasonable as a matter of law.  Rudolph

25  v. Metropolitan Airports Commission, 103 F.3d 677, 684 (8th Cir.

26  1996); Leever, 360 F.3d at 1019 (discussing the Eighth Circuit's

27  decision in Rudolph with approval).  In Rudolph v. Metropolitan

28  Airports Commission, the Eighth Circuit held that the agreement

24

between the plaintiff employees and the defendant was reasonable, despite the fact that the employees claimed to have regularly worked in excess of the time for which they were paid.  103 F.3d at 684.  The parties' agreement explicitly dictated the amount of time the plaintiffs were to spend on their job duties and specified that the plaintiff needed to obtain prior approval for any additional time they thought necessary.  Id. at 683.  The court reasoned that the defendant was entitled to rely on the plaintiff to follow the clear terms of the agreement by not performing additional work without prior approval.  Id. at 684.  Therefore, the court found the agreement reasonable as a matter of law pursuant to § 785.23.  Id.

With respect to the constructive agreement relating to defendant's policy for hours and compensation on holidays, the agreement was reasonable as a matter of law because defendant was entitled to rely on the clear terms of the 2002 memo.  The 2002 memo provides that plaintiff needed to obtain prior approval for any work performed on holidays that he thought was necessary.  (Ex. E to Barton Decl.).  Like the defendant in Rudolph, defendant District was entitled to rely on its explicit direction that plaintiff was not to work on holidays without prior authorization.  As such, the constructive agreement with respect to holiday hours was reasonable.  Therefore, plaintiff is not entitled to back-pay for work that was not pre-approved by the District on holidays.

However, with respect to the constructive agreement relating to defendant's general policy for hours and compensation, there is a triable issue of fact regarding whether the District took

25

into account the actual numbers of hours worked by plaintiff.
Defendant District contends that in 1995, a personnel committee
reviewed the damtenders' duties and compensation.  (PUF ¶¶ 67-
69).  The committee determined that plaintiff should average less
than 8 hours per day annually, except in flood years.  (Ex. B to
Barton Decl.).[10]  However, while the memo implicitly contemplates
that plaintiff might work more than eight hours per day in flood
years, it does not address how many more hours the District
anticipated plaintiff would work or how many more hours plaintiff
actually worked.  The committee also could not identify why
plaintiff was working long hours during nonrelease periods and
recommended that plaintiff keep a detailed time card.  (Ex. D to
Barton Decl.).  However, there is no evidence that plaintiff was
ever instructed to keep or submit time cards to the District.
Rather, plaintiff declares that he was never asked or told to
keep a timecard.  (Carman Decl. ¶ 6).

Further, defendant has failed to present evidence that it
made any inquiry into the number of hours actually spent by
plaintiff in the performance of his duties.  See id. ("[T]he
number of hours actually worked is clearly 'pertinent' to the
question of how much compensation ought to be paid for that
work.").  O'Halloran states that he had conversations with Carman
regarding the duties of his job and learned that the duties for
the position are fairly light and limited.  (Decl. of Tim
O'Halloran ("O'Halloran Decl"), filed Dec. 13, 2007, ¶ 1).

[10]     Both Exhibit B and D are memos to Jim Eagan, the
General Manager of the District at the time.  There is no
evidence that these memos were sent to or received by plaintiff.

However, the declaration is silent regarding any inquiry of plaintiff regarding the numbers of hours he was actually working. Plaintiff contends that he never described his duties as light or limited, and that he told O'Halloran that he worked twenty-four days, seven days per week. (Carman Decl. ¶ 5). O'Halloran took this as a joke, stating that he knew Carman was not working "24/7." (O'Halloran Decl. ¶ 7). Moreover, defendant did not require pre-approval for hours exceeding a certain threshold. Cf. Rudolph, 103 F.3d 677.

Therefore, there is a triable issue of fact regarding whether the parties' constructive agreement as to non-holiday hours was reasonable. See Chao v. Jasmine Hall Care Homes, Inc., No. 05-1306, 2007 WL 2069932, at *5 (E.D. Cal. July 16, 2007) (denying defendants' motion for summary judgment based in part on § 785.23 because there were genuine issues of material fact concerning, *inter alia*, how many hours the employees actually worked, what was expected of them under the agreement, and how much knowledge the defendants had of any alleged overtime). Furthermore, pursuant to the 1995 memo cited by defendant, plaintiff was expected to work an average of less than 8 hours per day annually. Section 785.23 merely offers a methodology for calculating how many hours plaintiff actually worked. If that number exceeds 40 (and in this case, the average anticipated hours would exceed 40 if plaintiff worked 6 hours per day 7 days a week), "the additional hours must be paid at the time-and-a-half rate demanded by 29 U.S.C. § 207(a)." Brigham, 357 F.3d at 942. Under Ninth Circuit precedent, even if the agreement is /////

27

reasonable, a determination of the overtime payment owed is still required.

Therefore, defendant's motion for summary judgment regarding plaintiff's claim for back-pay for overtime hours worked on holidays is GRANTED. Defendant's motion for summary judgment based on the applicability of § 785.23 regarding plaintiff's claim for back-pay for overtime hours actually worked[11] on non-holidays is DENIED.

## C.   Compensability of "On-Call" Time

Defendant further contends that plaintiff's claims for overtime and minimum wage fail because his time spent "on-call," when he was not actively engaged in duties for the District, is not compensable under the FLSA. Whether an employee was "engaged to wait," which is compensable, or "waiting to be engaged," which is not compensable, must be determined by the circumstances in a given case. Brigham, 357 F.3d at 935 (quoting Owens, 971 F.2d at 350). The two predominant factors in deciding whether on-call waiting time is compensable overtime are (1) the agreements between the parties; and (2) the degree to which the employee is free to engage in personal activities. Berry, 30 F.3d at 1180 (citing Owens, 971 F.2d at 350). Whether there is an agreement between the parties that employees would receive compensation for on-call waiting time is a question of fact. Id. "[W]hether the limitations on the employees' personal activities while on-call are such that on-call waiting time would be considered

---

[11]   For the reasons set forth *infra*, plaintiff's claim for back-pay for hours that he was on-call, but not actively working are not compensable.

compensable overtime under the FLSA is a question of law." Id.
(citing Birdwell v. City of Gadsen, Ala., 970 F.2d 802, 807 (11th
Cir. 1992)).

The inquiry regarding the first predominant factor, the
agreement between the parties, is significant to the extent that
the terms of the agreement may assist the trier of fact in
determining whether the parties characterized the time spent
waiting on-call as actual work.  Berry, 30 F.3d at 1181.
However, such agreements are not controlling as to the character
of the uncompensated time at issue.  Id.

In this case, as set forth above, the undisputed evidence
demonstrates that there was a constructive agreement between
plaintiff and defendant regarding compensation.  However, nothing
in the agreement plainly addresses on-call waiting time or
whether such time was compensable.  Therefore, the constructive
agreement between the parties does not weigh in favor or against
the conclusion that on-call waiting time is compensable.

The proper inquiry regarding the second predominant factor,
the degree to which an employee is free to engage in personal
activities, is "whether an employee is so restricted during on-
call hours as to be effectively engaged to wait."  Berry, 30 F.3d
at 1182.  In Owens, the Ninth Circuit "enumerated an illustrative
list of factors to consider in gauging the extent to which
employees could pursue personal activities during the course of
their on-call shifts."  Brigham, 357 F.3d at 936 (quoting Owens,
971 F.2d at 351).  Such factors include:

> (1) whether there was an on-premises living
> requirement; (2) whether there were excessive
> geographical restrictions on employee's movements; (3)

whether the frequency of calls was unduly restrictive;
(4) whether a fixed time limit for response was unduly
restrictive; (5) whether the on-call employee could
easily trade on-call responsibilities; (6) whether the
use of a pager could ease restrictions; and (7) whether
the employee had actually engaged in personal
activities during call-in time.

Id. at 936.  No one factor is dispositive, and the court "should

balance the factors permitting personal pursuits against the

factors restricting personal pursuits to determine whether the

employee is so restricted" that waiting time should be

compensated.   Id.  Although the limitations on personal

activities inquiry is a question of law, on a motion for summary

judgment, where there is a genuine dispute relating to the facts

relevant to these factors, the court will accept plaintiff's

version of the facts.

Plaintiff was required to be on the Dam premises every day,

unless he took vacation or sick leave (factor 1).  Plaintiff was

subject to some geographic constraints (factor 2); he had to

respond within thirty minutes of receiving notice to carry out

water releases.  (Carman Decl. ¶ 33).  Further, during flood

season, plaintiff had to remain on the premises for up to two

weeks at a time because of the weather and risk of flooding

(factor 4).  (Carman Decl. ¶ 35).  There is no evidence that,

during the applicable period, Carman traded or could trade on-

call responsibilities (factor 5).

Plaintiff contends that the mobile phone and pager would do

little to lessen the burdens of his duties because of the remote

location of the Dam (factor 6).  However, it is undisputed that,

although plaintiff carried a pager, he received only between 10

and 20 notifications per year (factor 3).  (PUF ¶ 125).

30

Plaintiff was free to leave the premises to attend personal
matters, such as having dinner with his wife, with the use of the
pager and mobile phone (factor 6).  The sounding of the alarms
for the hydro facility or Copsey Creek were also infrequent, and
neither plaintiff nor his wife could remember the number of times
plaintiff responded to the alarm since 2002.  (PUF ¶ 109).  It
was also relatively rare that plaintiff read the gauges outside
of normal hours.  (PUF ¶ 106).

Furthermore, the undisputed evidence demonstrates that
plaintiff was able to engage in personal activities when he was
on call (factor 7).  Over the years, plaintiff made many
improvements to the home at the Dam, including installing a deck,
pool, hot tub, and workshops, repainting the residence, and
replacing the refrigerator, water heaters, and swamp coolers.
(PUF ¶¶ 89-90).  Plaintiff was free to have visitors, and his
grandson visited quite often and stayed with Carman; over the
past five years, Carman's grandson stayed on the property
approximately fifteen to twenty times.  (PUF ¶ 112).  Plaintiff
could spend his free time watching television.  (PUF ¶ 116).
Plaintiff has also been a member of the Masonic Lodge for fifteen
years.  (PUF ¶ 118).  He has held a variety of positions in the
lodge, including Steward, Junior and Senior Deacon, Junior and
Senior Warden, and Master.  (PUF ¶ 119).  He attended one meeting
a month, if the season and weather permitted, and spent from two
to eight hours per month performing duties associated with the
lodge.  (PUF ¶ 118).

On balance, the <u>Owens</u> factors weigh against finding that
plaintiff's on-call time was compensable.  The response-time

restrictions placed on plaintiff were not particularly severe;
plaintiff received only between ten and twenty pages per year and
the alarms sounded infrequently.  Plaintiff also had a half hour
to respond to notifications from the District.  See Berry, 30
F.3d at 1184 (finding on-call time not compensable where
employees required to remain in the county and to respond to
calls within fifteen minutes); Owens, 971 F.2d at 349 (finding
on-call time not compensable where employees required to reply
within ten minutes of receiving a call or page).  Further, while
release of water from the Dam was important to prevent flooding,
there is no evidence that plaintiff's duties put him in the
position of being responsible for the safety of *thousands* of
people and thus, required him to be both immediate and absolutely
prepared in his responses.  Cf. Brigham, 357 F.3d at 938 (finding
that the Owens factors weighted narrowly in favor of the
employees were they were subject to the constant pressures of
being absolutely prepared to respond to emergencies where the
safety of thousands was at stake).  Moreover, while plaintiff was
required to live at the facility and was subject to geographic
constraints, the undisputed evidence demonstrates that he engaged
in a variety of personal pursuits including home improvement,
construction projects, having visitors, watching television, and
participating at the Masonic Lodge.  As such the record does not
demonstrate that plaintiff's on-call time "was so restricted that
it could not be used for personal activities."  Serv. Employees
Int'l Union Local 102 v. County of San Diego, 60 F.3d 1346, 1355
(9th Cir. 1994) (concluding that requiring a park ranger to be
on-call at night to respond to inquiries and enforce park rules

1  was not so restrictive that on-call time could not be used for
2  personal activities).

3      Based upon the foregoing analysis of the <u>Owens</u> factors,
4  plaintiff was not "so restricted during on-call hours as to be
5  effectively engaged to wait." <u>Berry</u>, 30 F.3d at 1182.
6  Therefore, and because the constructive agreement between the
7  parties holds no weight in this analysis, plaintiff's time spent
8  "on-call" is not compensable under the FLSA.  As such,
9  defendant's motion for summary adjudication on this issue is
10 GRANTED.

11     However, although plaintiff's time not spent actively
12 working is not compensable under the FLSA, there is a genuine
13 issue of fact regarding how many hours plaintiff was on-call and
14 how many hours plaintiff actually worked.  Therefore, defendant's
15 motion for summary judgment regarding plaintiff's
16 FLSA overtime claims based on non-holiday hours actually worked
17 by plaintiff is DENIED.

18 **D.   Minimum Wage**

19     Defendant contends that summary judgment should be granted
20 as to plaintiff's minimum wage claim because, even assuming
21 plaintiff worked 17 hours a days for seven days a week or 24
22 hours a day for three days a week, his hourly wage is still in
23 excess of the applicable federally mandated minimum wage of
24 $5.15.  <u>See</u> 29 U.S.C. § 206 (2004).

25     One effect of the FLSA was "to raise substandard wages first
26 by a minimum wage." <u>Hodgson v. Baker</u>, 544 F.2d 429, 432 (9th
27 Cir. 1976) (quoting <u>Overnight Motor Transp. Co., Inc. v. Missel</u>,
28 316 U.S. 572, 577 (1942)).  An employee's regular rate of pay is

33

calculated by dividing the employee's salary by the number of hours worked.  Id. at 433; see 29 C.F.R. § 548.3 (West 2008). The workweek is the applicable standard in determining whether an employer has complied with minimum wage requirements.  29 C.F.R. § 776.4 (West 2008); 29 C.F.R. § 778.104 (West 2008) ("The Act takes a single workweek at its standard and does not permit averaging of hours over 2 or more weeks.").

As set forth above, plaintiff's on-call time is not compensable.  However, plaintiff presents evidence that during flood season, he worked up to 24 hours straight for up to three days at a time.  Viewing the evidence in the light most favorable to the plaintiff, he may have worked up to six 24 hour days in one week.  Plaintiff also presents evidence that we worked a minimum of twelve hours per day, but worked sixteen hours per day more than half the time.  Assuming that defendant did not pay overtime, and assuming that plaintiff worked six days at 24 hours per day and one day at 16 hours per day, this equates to an hourly wage of approximately $4.92 per hour, when plaintiff was being paid at his highest rate of $3,414.40 per month.[12]  This is below the applicable federally mandated minimum wage of $5.15. Therefore, defendant's motion for summary judgment regarding plaintiff's Second claim relief that defendant failed to pay minimum wage in violation of the FLSA is DENIED.

/////

/////

_____

[12]   In 2006, plaintiff made his highest wage of $3414.40 per month.  Therefore, he was making $787.94 per week. ($3414.40/month x 12 months/year ÷ 52 weeks/year = $787.94/week). If plaintiff worked 160 hours per week, he made $4.92 per hour.

**E.    Additional Retirement Benefits**

Finally, defendant moves for summary judgment on plaintiff's equitable claim that he is entitled to additional retirement benefits.  The District contends that because Carman is not entitled to additional compensation, his claim for additional benefits must also be denied.  However, because plaintiff has raised triable issues of fact regarding whether he is entitled to additional overtime and minimum wage compensation, defendant's motion on plaintiff's claim for equitable relief must similarly be DENIED.

CONCLUSION

For the foregoing reasons, defendant's motion for summary judgment is GRANTED in part and DENIED in part:

(1)    Defendant's motion for summary judgment regarding plaintiff's claim for meal and rest periods is GRANTED.

(2)    Defendant's motion for summary judgment regarding plaintiff's claim for back-pay for overtime hours worked on holidays is GRANTED.

(3)    Defendant's motion for summary adjudication on the issue of whether plaintiff's on-call time is compensable is GRANTED.

(4)    Defendant's motion for summary judgment regarding plaintiff's FLSA overtime claims based on non-holiday hours actually worked by plaintiff is DENIED.

(5)    Defendant's motion for summary judgment regarding plaintiff's claim for minimum wage violations is DENIED.

/////

35

1        (6)   Defendant's motion for summary judgment regarding

2              plaintiff's claim for equitable remedies pertaining to

3              his retirement benefits is DENIED.[13]

4        IT IS SO ORDERED.

5   DATED: January 23, 2008

6

7

8                                    _____
                                     FRANK C. DAMRELL, JR.
                                     UNITED STATES DISTRICT JUDGE

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

26        [13]    In his opposition, plaintiff asserted arguments
    relating to a three year statute of limitations based upon
27  willful conduct.  However, defendant did not move for summary
    judgment on this issue and thus, it is not presently before the
28  court.

                              36